Filed 8/7/13  P. v. Torres CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JESSE TORRES,<br><br>    Defendant and Respondent. | E054937<br><br>(Super.Ct.No. FWV1001444)<br><br>O P I N I O N |

APPEAL from the Superior Court of San Bernardino County.  Jon D. Ferguson, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

A jury found defendant and appellant, Jesse Torres, guilty as charged of two counts of attempted murder and two counts of assault with a deadly weapon, a knife, for stabbing two brothers, Marcos Arroyo and Manuel Delgado, at a neighborhood party. (Pen. Code, §§ 664, 187, subd. (a), 245, subd. (a)(1).)[1] The jury also found the attempted murders were premeditated and found great bodily injury and gang enhancements true on all four counts. (§§ 664, subd. (a), 12022.7, subd. (a), 186.22, subd. (b)(1).) Defendant was sentenced to 10 years plus 30 years to life in prison.[2]

On this appeal, defendant claims insufficient evidence supports: (1) the intent to kill element of his attempted murder convictions; (2) the premeditation findings; and (3) the gang enhancement findings. He also claims the court abused its discretion and violated his due process right to a fair trial in refusing to bifurcate the gang allegations and erroneously denied his motion for a new trial based on ineffective assistance. We find these claims without merit and affirm the judgment in all respects.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The sentence includes two consecutive 15-year-to-life terms for the premeditated attempted murder convictions (§§ 664, 187, subd. (a), 186.22, subd. (b)(1)(C)), consecutive three-year terms for the great bodily injury enhancements on those convictions (§ 12022.7, subd. (a)), plus four years for four prison priors the court found true (§ 667.5, subd. (b)). Additional terms were imposed but stayed on the assault convictions (§ 245, subd. (a)(1)) and on the great bodily injury and gang enhancements on those convictions.

2

A. *Prosecution Evidence*

    1. <u>The Stabbings</u>

On May 22, 2010, Carla Jimenez and her boyfriend, Jesus Delgado, were living on West Park Street in Ontario with Jesus's brother, Romero Delgado, and Carla's daughters.[3] Around 3:30 p.m., Carla and Jesus began holding a barbecue and party in their front yard. Jesus's other brothers, Manuel Delgado, Marcos Arroyo, and Julian Atunez, attended the party as did Carla's friend, Jose Prillwitc, and several children. The house was surrounded by a three-foot high fence and a liquor store, Moons Market, was next door.

Around 5:00 to 6:00 p.m., defendant's younger brother, Hilario Martinez, who was known as "Little Looney," was standing near the pay telephone in front of Moons Market and threw a bottle toward Carla and Jesus's front yard. The bottle broke, causing pieces of glass to fall into the yard. At that point, many people were still in the yard, including Jesus, Marcos, Manuel, and Julian, and all of them had been drinking. Carla, Jose, and Romero were not drinking.

Jesus stepped outside the yard, with Julian and Carla behind him, and yelled to a group of 16 to 17-year-old males, "who threw the bottle?" Hilario, who was 16 to 17 years old at the time, defiantly said, "it was me," and used profanity. Jesus said, "can you

---

[3] For ease of reference and with no disrespect intended, we refer to persons by their first names.

please calm down because we are having a barbecue. My family is here. My daughter is here." Jesus, Julian, and Carla then walked back into the yard.

Hilario said, "I'm going to go get my brother Looney," meaning defendant. Jesus said, "go bring him. He's our friend. We're cool." Julian also told Hilario he knew Looney and said something like, "Yeah. Go bring him." Hilario said he was going to get Looney again and showed Julian his phone, indicating he was calling Looney.

Carla also knew defendant and was friendly with him. About a week earlier, defendant came by the house and had a beer with Jesus. Carla and Jesus knew defendant belonged to a gang because when he walked by or came to their house he would say, "This is Black Angels, Homey," or "Onterio Black Angels," in a friendly way. Julian also knew defendant was a gang member because "everybody" who lived in the area knew.

By 9:30 p.m., Jesus, Julian, Marcos, and Manuel were still in the front yard and each had drunk several beers. A light on Carla's house was illuminating the front yard, and there was another light in front of Moons Market.

Defendant and Hilario walked up and stepped into Carla and Jesus's yard. Defendant looked angry and asked Hilario, "Who was it?" Hilario pointed out Julian and said, "That guy right there."

Defendant said to Julian, "Hey you. Come outside. I want to talk to you." Julian, defendant, and Hilario walked to the front of Moons Market. Jesus and Marcos walked behind Julian. Julian was unarmed and thought defendant was just going to talk to him.

4

Defendant said, "What's up," and just as Julian "pointed at Little Looney [Hilario] to explain to Big Looney [defendant] what was going on," defendant punched Julian in the face, knocking him to the ground. The punch caused Julian to momentarily black out and defecate in his pants. Defendant punched Julian several more times as Julian regained consciousness and tried to cover himself.

Carla and Manuel saw defendant sit on Julian's legs, grab him by the neck with his left hand, and use his right hand to reach into his back pocket, apparently in an attempt to remove something. Believing defendant was about to pull out a knife, Carla yelled, "oh, my God!" Marcos grabbed defendant by the shoulder, and asked him, "Can we talk?" Marcos also said he did not want any trouble and asked defendant to calm down. Jesus told defendant to "chill" and also tried to talk to him. Either Jesus or Marcos pulled defendant off Julian, and Julian got up and ran inside the house.

At this point, 5 to 13 other men were with defendant. Carla believed the men were Ontario gang members like defendant. One of the men punched Jesus in the jaw, knocking him to the ground unconscious. Some of the other men then began throwing bottles at Carla and Jesus's yard.

Defendant pulled a knife from his back pocket, opened the knife, and said, "You guys fucked up," several times. The knife had a six-inch blade. Defendant used his left hand to grab Marcos from behind his neck and left shoulder, pulled Marcos near his chest, and used his right hand to stab Marcos in the stomach twice. Marcos began to fall

5

to the ground, then got up holding his stomach. Carla yelled that defendant had a knife and called 911.

Carla and Jose assisted Jesus to the house while Manuel tried to assist Marcos, who was bleeding from his two stab wounds. Defendant and five or six other men then rushed at Manuel, and one of the other men punched Manuel in the face and knocked him to the ground. Defendant and the five or six men began kicking Manuel in the face and back. Defendant then put his left knee on Manuel's hand as Manuel lay on the ground, stabbed Manuel twice in the stomach, then sliced Manuel's forehead with the knife.

While Manuel was being attacked, Jose helped Marcos inside the house. Manuel also went into the house after he was stabbed. Jose grabbed a butcher knife from the kitchen and ran outside. At this point, defendant and a number of his male associates were still outside. Defendant and his associates saw Jose with the knife, and defendant laughed, pointed to the lower portion of his forearms, and loudly said, "Black Angels." Defendant and his associates ran off, and defendant was the last to leave.

Marcos was bleeding from two holes in his lower abdomen, blacked out, and was taken by ambulance to the hospital. He had surgery that left two scars on his abdomen.

Manuel had two stab wounds in his stomach and a large cut on his forehead, and was also taken to the hospital. The two stab wounds in Manuel's stomach required one stitch each to close, and the stab wound on his forehead required seven stitches to close. Manuel did not require surgery and was released from the hospital the next afternoon with pain pills.

6

2. The Investigation and Aftermath of the Stabbings

Ontario Police Officer Gabe Gutierrez assisted in investigating the stabbings. After hearing defendant was involved, he went to defendant's house on South Oakland in Ontario on the night of May 22, 2010, but defendant was not home. Nor was he at his mother's house down the street. On June 16, 2010, defendant was taken into custody at a known gang hangout in Ontario. The knife used to stab Marcos and Manuel was never found.

Manuel was initially afraid to identify anyone as being involved in the incident because he believed they were gang members. He was more comfortable testifying at the preliminary hearing. Carla moved out of her house because she feared defendant's gang status and retaliation from gang members. Julian moved away from Ontario two to three weeks after the incident.

3. Expert Gang Testimony

Officer Gutierrez testified as a gang expert for the prosecution. He was familiar with an Ontario gang known as South Side Onterio (SSO). The gang has the largest membership of any gang in the City of Ontario, some 500 documented members and associates, and few other gangs will challenge them. The purpose of the SSO is to make money, and its primary activities to fulfill that purpose include homicides, stabbings, assaults with deadly weapons, narcotics sales, extortion, witness intimidation, and other crimes ranging down to graffiti.

The house on Park Street where the stabbings occurred is "in the heart" of SSO gang territory. Respect is "huge" with Hispanic street gangs. The gang will not tolerate acts of disrespect in its territory. If someone disrespects a gang member's brother, the member would not address the matter as an individual, but would come as a gang member and with the backing of his entire gang to "take care of business." Fellow gang members could be called to the scene to assist in an assault.

SSO is the umbrella name for three levels of Ontario gangs; the top level is Black Angels. Black Angels is a multigenerational familial gang and consists of two cliques called Belmont Street and Sunkist Street. The gang uses hand signals, tattoos, and other symbols to signify membership, and its members have "monikers" or gang nicknames.

Officer Gutierrez was familiar with defendant. On May 22, 2010, defendant was a member of the Sunkist Street clique of the Black Angels and his gang moniker was "Looney." Defendant was a self-admitted gang member and since 1993 had been contacted numerous times by law enforcement. He had multiple gang-related tattoos, including a "B" on one forearm, an "A" on his other forearm, and "Fuck a Job" on the side of his head, indicating he is a full-time gang member and a regular job is not for him.

Officer Gutierrez testified concerning the Street Terrorism Enforcement and Prevention Act predicate offenses committed by other Blank Angels members, namely, two attempted murders in 2007 and 2008. In one of these attempted murders, on May 8, 2008, Black Angels gang member Andrew "Dicer" Navarro stabbed someone at a party and rendered him a quadraplegic while repeatedly yelling "Black Angels" as he

8

committed the stabbing. Officer Gutierrez opined that defendant stabbed Marcos and Manuel for the benefit of his gang. He shouted "Black Angels" after the stabbings, and pointed to the "B" and "A" tattoos on his forearms. The crimes benefited the gang because they would make anyone in the neighborhood think twice before "messing with" another Black Angels gang member.

B. *Defense Case*

Defendant's younger brother Hilario testified he was in the ninth grade at the time of the stabbings. He denied being in a gang, did not think defendant was in a gang, and did not think defendant's tattoos were gang related. During the evening of May 22, 2010, he went to his friend Enrique's house located across the street from Moons Market. He and Enrique were with two girls and heard the party across the street. Hilario knew Julian, Marcos, Manuel, and Jesus from playing basketball with them.

Julian walked up to Hilario next to the market and "aggressive[ly]" asked him whether he had thrown a bottle in the street. Hilario denied throwing the bottle and told Julian he had come over to the market to find out who had. Manuel, Marcos, and Jesus then walked up, surrounded Hilario, and accused him of throwing the bottle. All of them appeared to be drunk. Fearing he would be attacked, Hilario said he was going to call his brother "Looney." He used his cell phone to call defendant and told him he was being picked on. After calling defendant, Hilario walked away from Manuel, Marcos, and Jesus, and went to Enriquez's house.

9

Ten to 15 minutes later, defendant arrived at the front yard in front of Enriquez's house, on foot. He brought a "friend" with him and smelled like alcohol. Hilario told defendant the people picking on him were across the street. Hilario, Enriquez, defendant, and the "friend" then walked across the street to the party. Defendant called Julian over to talk to him and they walked near the market. Marcos, Manuel, and Jesus followed them. Marcos had a bottle in his hand. Hilario followed as well.

Hilario saw Julian throw a punch, defendant dodged it, and a fight ensued between defendant and Julian. Julian got on top of defendant. Then Manuel and Hilario began throwing punches at each other. Hilario then fought with Jesus. Hilario could see someone throwing bottles. While Hilario was fighting with Manuel and Jesus, he did not see what was happening with defendant. Eventually, Hilario saw defendant on the ground with Julian and Marcos kicking and punching him. Julian had a bottle in his hand. Hilario ran to defendant, got him off the ground, and the two of them began running away with bottles breaking all around them.

On cross-examination, Hilario admitted he would lie for defendant, but claimed he was not lying now. He did not think defendant was a gang member despite his tattoos. He said that to start the fight, Julian pushed defendant but did not punch him. Then, on redirect examination, Hilario said Julian threw the first punch.

Hilario asked his friend Jerry Morales to testify for defendant. Morales testified that defendant was with the "Onterio gang" and his tattoos signified his membership. During the evening of May 22, 2010, defendant was at Morales's house located next door

10

to defendant's mother's house.  Defendant drank three or four beers.  He could stand up, but his eyes were red and he was speaking slowly.  He received a call sometime after dark, told Morales someone was "fucking with his little brother," and left Morales's house.

C. *Rebuttal*

Officer Gutierrez had known Hilario since Hilario was in elementary school. Hilario had begun to hang out with gang members in the neighborhood, and defendant and Officer Gutierrez had agreed to try to keep Hilario out of the gang.  Officer Gutierrez opined Hilario was an associate of the gang based on his actions in the neighborhood and his attendance at a gang-related funeral.[4]

## III.  DISCUSSION

A. *Substantial Evidence Supports the Intent to Kill Element of the Attempted Murder Convictions, the Premeditation Findings, and the Gang Enhancements*

Defendant was convicted of the attempted murders of Marcos and Manuel in counts 1 and 2, and the jury found he acted with premeditation and committed the offenses for the benefit of his gang.  Defendant challenges the sufficiency of the evidence

---

[4] During the prosecution's case-in-chief, Officer Gutierrez testified that the distinction between a gang member and an associate is slim.  A member is a proven person who has "put in work" for the gang and has respect in the neighborhood.  An associate is a "wannabe," or someone who is trying to earn respect to show they are worthy of gang membership.  "Putting in work" is a path to membership and respect for associates, and because of that associates can be more dangerous than actual gang members.  Putting in work can encompass many things, including driving gang members around or stabbing or shooting someone.  The more work a member or associate puts in, the more he benefits with the gang.

11

he (1) intended to kill Marcos and Manuel, (2) acted with premeditation, and (3) committed the offenses for the benefit of his gang.  We reject these challenges to the sufficiency of the evidence.

    1.  Standard of Review

We apply a settled standard of review in considering a challenge to the sufficiency of the evidence to support a criminal conviction.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  We review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt.  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)  We must accept all logical inferences the jury might have reasonably drawn from the evidence.  (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)  The same standard of review applies in determining the sufficiency of the evidence to support a sentencing enhancement.  (*People v. Gonzales* (2011) 51 Cal.4th 894, 941; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.)  If the circumstances reasonably justify the trier of fact's verdict or findings, our opinion that the circumstances might also support a contrary finding does not warrant reversal.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)  As will appear, we reject defendant's attempts to reargue the persuasiveness of and inferences to be drawn from the evidence, and conclude the jury could have reasonably inferred that defendant acted with the intent to kill, with

premeditation and deliberation, and for the benefit of his gang when he stabbed Marcos and Manuel—even though the evidence also supports contrary conclusions.

2. <u>Intent to Kill</u>

"'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Stone* (2009) 46 Cal.4th 131, 136.) Defendant argues the evidence is insufficient to show he intended to kill Marcos or Manuel when he stabbed them. He argues the evidence showed he acted rashly in stabbing the victims and did so without intending to kill them. He maintains there is "no evidence" he went to Carla's house with the intention of killing anyone and no evidence he picked a fight with either victim. He argues that "it was virtually undisputed that both [victims] were stabbed only when they intervened in the fight" between himself and Julian. He also questions the credibility of Carla and Manuel, including their varying accounts of when and whether they saw him pull out a knife.

These attempts to reargue the evidence or the reasonable inferences it supports are unavailing. Viewed in the light most favorable to the attempted murder convictions, the evidence supports a reasonable inference that defendant acted with an intent to kill when he stabbed Marcos and Manuel in their abdomens—particularly in view of the fact defendant stabbed the victims more than once in their abdomens, a vital area of their bodies, and the broader circumstances in which the stabbings occurred. (*People v. Ramos* (2011) 193 Cal.App.4th 43, 48 ["Evidence of intent to kill is usually inferred from defendant's acts and the circumstances of the crime."].)

13

Substantial evidence of intent to kill can be inferred from the fact defendant used a deadly weapon, such as a knife, and targeted a vital area of the victim's body, such as the abdomen. (*People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [sufficient evidence of intent to kill shown from the defendant's act of stabbing the victim in the abdomen, an "extremely vulnerable area of the body," with all his might and effort]; *People v. Bolden* (2002) 29 Cal.4th 515, 561 ["defendant could have had no other intent than to kill" when he plunged the knife deeply into a "vital area of the body of an apparently unsuspecting and defenseless victim"].) It is unnecessary for the victim to have suffered serious or life-threatening injuries for the defendant to have intended to kill the victim. (*People v. Avila* (2009) 46 Cal.4th 680, 701-702.)

As the prosecutor argued, the evidence showed defendant originally intended to kill Julian when he was sitting on Julian and reached for a knife in his back pocket. Then, after Marcos pulled defendant off Julian, defendant's intent to kill Marcos could be inferred from his initial intent to kill Julian and by the fact he stabbed Marcos *twice* in the abdomen—a vital area of the body—using a knife with a six-inch blade, and pulled Marcos toward him when he stabbed him to stab him more forcefully. Then, when Manuel attempted to assist Marcos, defendant stabbed Manuel *twice* in the abdomen, using the same six-inch blade knife.

The fact defendant stabbed each victim *more than once* in the same vital area of their bodies supports a reasonable inference he intended to kill both of them, even if, as

14

defendant argues, the evidence also supports a reasonable inference he acted rashly, in a heat of passion, and without an intent to kill when he stabbed them.

The broader circumstances of the stabbings further support a reasonable inference that defendant intended to kill the victims. Defendant was a Black Angels gang member and the gang's primary activities included assaults and attempted murders. Defendant was informed that someone at the party at Carla's house had "picked on" Hilario—an act of disrespect that could not be tolerated in the gang's culture or territory. Defendant brought numerous gang members with him when he went to Carla's house and sought out Julian, the one who had picked on Hilario. The evidence supports a reasonable inference that defendant, in order to gain more respect and status within his gang, intended to kill Marcos and Manuel when they prevented him from stabbing and killing Julian.

3. Premeditation

The punishment for attempted murder is increased when the murder attempted was "willful, deliberate, and premeditated." (§ 664, subd. (a); *People v. Bright* (1996) 12 Cal.4th 652, 656-657.) An attempted murder is "premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) "'"Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" [Citation.] "'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'""

15

[Citation.]"  [Citations.]'  [Citation.]"  (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the California Supreme Court identified three types or categories of evidence pertinent to the determination of premeditation and deliberation:  (1) planning activity; (2) motive; and (3) manner of killing.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)  The *Anderson* court observed that courts typically sustain premeditation and deliberation findings "'when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).'"  (*People v. Perez, supra,* at p. 1125, quoting *Anderson, supra,* at p. 27.)

In other words, courts have generally found sufficient evidence of premeditation and deliberation when "'(1) there is evidence of planning, motive, and a method of killing that tends to establish a preconceived design; (2) extremely strong evidence of planning; or (3) evidence of motive in conjunction with either planning or a method of killing that indicates a preconceived design to kill.'"  (*People v. Tafoya* (2007) 42 Cal.4th 147, 172.)  Although these categories of evidence are not the exclusive means of establishing premeditation and deliberation (*ibid*.), and other types or combinations of evidence may also support a premeditation finding (*People v. Perez, supra,* 2 Cal.4th at p. 1125; *Anderson supra,* 70 Cal.2d at pp. 26-27), a finding of premeditation and deliberation will generally be upheld when all three *Anderson* factors are present (*People v. Stitely, supra,* 35 Cal.4th at p. 543).

16

Substantial evidence of all three *Anderson* factors—planning, motive, and a method of killing tending to show a preconceived plan—is present here. Defendant came to the party at Carla's house with numerous fellow members of his Blank Angels gang, looking for the person who had disrespected Hilario. Defendant knocked Julian to the ground and almost immediately attempted to pull a knife from his back pocket and stab Julian. This was evidence of planning—a preconceived plan and design to kill the person who had disrespected Hilario. Then, when Marcos and Manuel intervened and prevented him from stabbing Julian, the jury could have reasonably inferred that defendant reconsidered his options and preconceived a plan to kill them instead of Julian. He had a motive to kill the person or persons who were responsible for disrespecting Hilario because it would gain him status and respect in his gang. Finally, the manner of the stabbings—more than once in a vital area of each victim's body, the abdomen—was a method tending to establish a preconceived design to kill.

Defendant argues the evidence supports a contrary inference that he acted rashly and in the heat of the moment when he stabbed the victims, and not with premeditation or deliberation. But defense counsel made this argument, the jury rejected it, and substantial evidence supports the jury's contrary finding that the attempted murders were premeditated and deliberate.

4. Gang Enhancements

Finally, defendant claims insufficient evidence supports the jury's findings that he committed the premeditated attempted murders and assaults in counts 1 through 4 for the

17

benefit of his gang. (§ 186.22, subd. (b).) Rather, he argues the evidence showed only that the crimes were "a personal response" by him to "a perceived or actual wrong done to his little brother." (Capitalization omitted.) This claim, too, lacks merit.

Section 186.22, subdivision (b)(1) provides for an enhanced prison sentence for any person who is convicted of a felony (1) "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (*People v. Albillar, supra,* 51 Cal.4th at pp. 59-66.) Here, the evidence shows defendant committed the attempted murders and assaults in association with and for the benefit of his gang *and* with the specific intent to further the gang's criminal conduct.

Defendant was a self-admitted member of the Black Angels gang. He went to Carla's house, armed with a six-inch blade knife and with numerous members of his gang, apparently intending to avenge the disrespect to Hilario by assaulting and killing the person or persons responsible. The stabbings occurred in the heart of the gang's territory—a place where disrespect to the gang was not tolerated according to the prosecution's gang expert, Officer Gutierrez. And after he stabbed the victims, defendant yelled "Black Angels" and pointed to his gang tattoos, crediting both himself and his gang for the stabbings.

Officer Gutierrez explained that if someone disrespects a gang member's brother, the gang member will not avenge the disrespect as an individual, but will "take care of business" or avenge the disrespect as a gang member and with the backing of his entire

18

gang. Also according to Officer Gutierrez, the stabbings benefited the gang because they caused a family to move out of the neighborhood due to fear, rendering the family unable to report other gang crimes, and also because the crimes sent a message to others in the neighborhood not to "mess with" the Black Angels. Thus the jury could have reasonably inferred that defendant did not commit the crimes for personal reasons, or solely for personal reasons, but to benefit his gang and with the specific intent of promoting its criminal activities.

B. *The Court Properly Refused to Bifurcate the Gang Allegations*

Defendant claims the court's failure to bifurcate the gang enhancements from the charged offenses resulted in the admission of a "saturation" of irrelevant and unduly prejudicial gang evidence on the charged offenses that should have been excluded under Evidence Code section 352 and that deprived him of a fair trial on the charged offenses. We reject these claims.

1. Relevant Background

Defendant moved in limine to bifurcate the gang allegations from the attempted murder and assault charges and try the enhancements only if and after he was convicted of the charged offenses. Defense counsel argued that bifurcation should have been granted because there was no evidence the charged crimes were gang related because there was no evidence defendant's younger brother Hilario was an associate of the gang.[5]

---

[5] At this point, defense counsel had no information that Hilario was known or referred to as "Little Looney."

19

In other words, the defense claimed defendant committed the crimes for purely personal reasons involving his brother, and not to benefit his gang.

The prosecutor argued bifurcation was unwarranted because the evidence showed defendant had a gang-related motive to commit the crimes, regardless of whether Hilario was a gang associate. In addition, the prosecutor argued that gang evidence would shed light on why the stabbings occurred, whereas bifurcation would "hid[e] things" from the jury and give them a false sense of why the stabbings occurred.

The court denied the bifurcation motion based on evidence that defendant had a gang-related motive for the crimes as indicated by his gang affiliation, his gang tattoos, and his yelling "Black Angels" after the stabbings. The court further ruled that evidence of defendant's gang-related motive for committing the crimes was relevant and cross-admissible to prove the gang allegations. The court later allowed defendant to "federalize" his bifurcation motion, ostensibly on the ground the admission of gang evidence on the charged offenses would deprive him of his due process right to a fair trial on the charges.

During trial and before Officer Gutierrez testified as a gang expert, defense counsel said he had reviewed the officer's proposed PowerPoint slideshow presentation and renewed his bifurcation motion. Defense counsel also argued that certain slides, including those containing photographs of gang members other than those who committed the predicate offenses, among others, were unduly prejudicial and should be excluded under Evidence Code section 352. The court denied the renewed bifurcation

20

motion and ruled it would not exclude the PowerPoint presentation in its entirety on the ground most of it was probative of defendant's motive for the crimes, along with the gang allegations and the officer's credibility and expertise. At the court's urging, the parties ultimately agreed to examine each slide of the PowerPoint presentation to determine which individual slides might be unduly prejudicial.

After much discussion, the court excluded some slides as either unduly prejudicial or cumulative (Evid. Code, § 352), including a photograph of a child being brought into the gang, a young girl showing a gang sign, photographs of firearms related to the funding of the gang, and Black Angels members with ties to the Mexican Mafia. Among other gang-related evidence, the court allowed the prosecutor to present slides representing the history of the Black Angels, photographs of gang members showing Black Angels tattoos and hand signs, and photographs of Black Angels graffiti, emblems, and artwork.

2. Analysis

Courts have long recognized the potentially prejudicial effect of gang evidence, and for this reason its admission has been "condemned" if it is only *tangentially* relevant to the charged offenses. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) Thus, in cases *not* involving a gang enhancement, evidence of gang membership or gang evidence should be excluded if its probative value is minimal. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*); *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905.)

21

But "evidence of gang membership is often relevant to, and admissible regarding, the charged offense." (*Hernandez, supra,* 33 Cal.4th. at p. 1049.) For example, "[g]ang evidence is relevant and admissible [to a charged offense] when the very reason for the underlying crime, that is the motive, is gang related." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167; Evid. Code, § 1101, subd. (b).) And when gang evidence is relevant to prove the defendant's motive or intent in committing charged offenses, or some other fact concerning the charged offenses, other than criminal propensity, it is admissible as long as its probative value outweighs its prejudicial effect. (*Hernandez, supra,* at p. 1049; *People v. Albarran, supra,* 172 Cal.App.4th at pp. 223-224.)

Defendant does not argue on this appeal, as he did in the trial court, that Officer Gutierrez's expert gang testimony was not relevant to show he had a gang-related motive to commit the charged crimes. Nor does he argue that any additional slides contained in the officer's PowerPoint presentation should have been excluded as unduly prejudicial on either the charges or the gang allegations. Instead, he argues the court's refusal to bifurcate the gang allegations resulted in "a saturation of gang evidence" on the substantive charges that deprived him of his due process right to a fair trial on the charges. We find no abuse of discretion or due process violation in the court's refusal to bifurcate the gang allegations.

To be sure, bifurcation may be warranted when the evidence supporting a gang allegation is unduly prejudicial on the issue of the defendant's guilt of the underlying charge. (*Hernandez, supra*, 33 Cal.4th at p. 1049.) For instance, "[t]he predicate

offenses offered to establish a 'pattern of criminal gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even to the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation.  Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Id*. at p. 1049.)

The court nonetheless has broad discretion to deny bifurcation—even if some of the evidence offered to prove a gang enhancement would be inadmissible at a trial solely on the substantive charges—because, for example, some of the gang enhancement evidence would be excluded as unduly prejudicial on the substantive charges *when no gang enhancements are alleged.* (*Hernandez, supra,* 33 Cal.4th at p. 1050.)  The court's discretion to deny bifurcation is broad because "counterveiling considerations" often weigh in favor of a single, unitary trial.  (*Ibid*.)  One key counterveiling consideration arises when gang evidence, though it would be unduly prejudicial in a trial solely on the substantive charges, is not so inflammatory in a trial with gang allegations that it is likely to sway the jury to convict the defendant of the charges regardless of his guilt.  (*Id*. at pp. 1050-1051.)  In sum, the defendant has the burden "'to clearly establish there is a substantial danger of prejudice requiring that the charges [and gang allegations] be separately tried.' [Citation.]" (*Id*. at p. 1051.)

Here, defendant did not show there was a substantial danger of prejudice on the substantive charges absent bifurcation, and the court accordingly acted within its

23

discretion in refusing to bifurcate the gang allegations.  First, the nature of the charges—two counts of premeditated attempted murder and two counts of assault with a deadly weapon—was very serious and no less so than any of the gang evidence.  As the court pointed out in denying the initial bifurcation motion:  "The underlying charges have their own notoriety such that the gang enhancement[s] won't prejudice the defendant . . . making him sound worse than the charges do."

Second, much of Officer Gutierrez's expert gang testimony was relevant and unduly prejudicial on the charged offenses—even if no gang enhancements had been alleged—because it showed defendant had a gang-related motive for committing what otherwise would have appeared to be senseless crimes for which defendant had no motive, or an insufficient motive.  (Evid. Code, § 1101, subd. (b).)  The officer's explanation of gang culture and its concept of respect explained that defendant was motivated to commit the crimes to benefit his gang and further its criminal activities, and not for personal reasons or for no reason.  (*Hernandez, supra,* 33 Cal.4th at pp. 1049-1050 ["To the extent the evidence supporting the gang enhancement would be admissible at trial of guilt, any inference of prejudice would be dispelled"].)

Third, and most importantly, none of the officer's testimony was likely to persuade the jury to convict defendant of the charged crimes regardless of his guilt of those crimes.  To be sure, the officer testified in detail about the history of Ontario gangs and that, like all southern California Hispanic gangs, the SSO and Black Angels were under the jurisdiction of the Mexican Mafia.  The officer's slideshow presentation also

24

included photographs of what defendant calls "scary-looking" Black Angels, some of whom were members or leaders of the Mexican Mafia. The officer also testified that defendant admitted being a gang member multiple times during jail classification interviews, "thus notifying the jury [he] had been in jail on several occasions."

But none of the officer's testimony indicated defendant had ties to the Mexican Mafia, was involved in committing the predicate offenses, or committed any offenses for which he had escaped punishment. (*Hernandez, supra,* 33 Cal.4th at p. 1051.) In addition, defendant injected his gang status into the charged crimes by yelling "Black Angels" and pointing to his gang tattoos before he and his fellow gang members left the scene of the stabbings. Thus here, as in *Hernandez,* "[a]ny evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense[s], and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendant['s] actual guilt. Accordingly, [defendant] did not meet [his] burden 'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]" (*Ibid.*)

Defendant's due process claim fails for substantially the same reasons. "To prove a deprivation of federal due process rights, [defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be

25

inferred that the jury must have used the evidence for an improper purpose.'  [Citation.]"

(*People v. Albarran, supra,* 149 Cal.App.4th at p. 229.)

All of the gang evidence had a legitimate purpose in this trial—either to prove the gang allegations or to show defendant had a gang-related motive in committing the charged offenses.  As noted, none of the gang evidence indicated defendant had ties to the Mexican Mafia, was involved in committing the predicate offenses, or committed any offenses for which he had escaped punishment.

In sum, there is no reason to believe the jury used any of the gang evidence for an impermissible purpose, such as to punish defendant for crimes he did not commit.  (Cf. *People v. Albarran, supra,* 149 Cal.App.4th at pp. 230-231, fn. omitted [gang evidence rendered trial fundamentally unfair because it was "extremely and uniquely inflammatory" and the prosecution did not show it had any bearing on the defendant's intent and motive in committing the charged crimes].)  Thus here, none of the gang evidence rendered defendant's trial fundamentally unfair.

C. *The Court Properly Denied the New Trial Motion Based on Ineffective Assistance*

Lastly, defendant claims the trial court prejudicially erred in denying his motion for a new trial based on the ineffective assistance of his trial counsel.  We disagree.

1.  Relevant Background

Before trial, defendant's trial counsel, Kirk Tarman, moved to exclude defendant's criminal history in the event defendant testified.  The court ruled defendant could be impeached with a 1999 conviction for grand theft (§ 487) and a 2000 conviction for

26

corporal injury to a spouse or cohabitant (§ 273.5). At the time, neither party realized defendant had an aggravated assault conviction. (§ 245, subd. (a).)

Before sentencing, Mr. Tarman filed a motion for a new trial based on his own ineffective assistance. In a supporting declaration, he averred that when trial began he and defendant discussed whether defendant would testify in his own defense and "there was an ongoing dialog regarding that issue." After trial began the prosecutor told Mr. Tarman he had "uncovered a prior conviction" for assault with a deadly weapon, and Mr. Tarman told defendant there was "very little chance of winning the case" if the prosecutor "were able to get that into evidence via impeachment."

Mr. Tarman also stated that at some later point during the trial, the prosecutor told him he was incorrect and "there was no weapon allegation," meaning the conviction was for assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), not for assault with a deadly weapon (§ 245, subd. (a)(2)). Mr. Tarman said he thought he "updated" defendant with this information, but he did not have "a clear recollection when and where."

Defendant also submitted a declaration in support of the motion, averring he had decided not to testify because the jury would have heard he had a conviction for "using a weapon in another case."

The court appointed conflict counsel Geoff Newman to represent defendant on the motion for a new trial. Mr. Newman filed his own motion for a new trial, claiming Mr. Tarman rendered prejudicial ineffective assistance in misinforming defendant about the

27

nature of the prior assault conviction and in failing to investigate his criminal background and ascertain the nature of the prior conviction.

Without a supporting declaration, Mr. Newman claimed that before Mr. Tarman mistakenly told defendant he had a prior conviction for assault with a deadly weapon, defendant had decided to testify in his own behalf, "hoping to explain to the jury that his actions were in self-defense. However, [Mr. Tarman] told [defendant] that the prior weapon offense [was] reason enough not to take the stand, worrying that the weapon in this case would expose [defendant] to extra scrutiny by the jury due to the prior weapon use." Mr. Newman also claimed, without a supporting declaration, that defendant did not learn until after trial that the prior conviction did not involve the use of a weapon, and had he known that during trial he would have testified.

The prosecutor filed an opposition to the motions, claiming that on May 9, 2011, the day trial commenced, he discovered during the evening, from defendant's CLETS history, that defendant had a prior conviction "for violating Penal Code section 245[, subdivision] (a)(1)" but "[i]t was unclear from the printout whether that conviction was for an assault with a deadly weapon, or an assault with force likely to cause great bodily injury; in other words, whether it was a strike or a non-strike offense." The prosecutor immediately telephoned Mr. Tarman, told him of the conviction, told him that if it was a strike the People would allege it in an amended information, and also told him that regardless of whether it was a strike the People would seek to impeach defendant with it

28

should he testify, because it involved moral turpitude. The next day, the People ordered defendant's "prior packet" on a rush basis.

The People received the prior packet on May 16, and it showed the conviction was not a strike, meaning it was for assault by means of force likely to produce great bodily injury and not assault with a deadly weapon. The court was not in session on May 16, and on May 17, the prosecutor notified Mr. Tarman that the conviction was not a strike and would not be alleged, but reiterated that the offense involved moral turpitude. The prosecution had not rested when the conversation took place. The defense called two witnesses on May 19, but defendant did not testify.

Regarding defendant's ineffective assistance claim, the prosecutor argued there was no credible evidence that Mr. Tarman did not advise defendant of the true nature of the conviction and, in fact, Mr. Tarman said he thought he had so informed defendant; he was just unsure when he did so. The prosecutor also argued it was questionable whether defendant would have testified had he known the prior conviction did not involve the use of a weapon, because it involved moral turpitude and still could have been used to impeach him.[6] Finally, the prosecutor questioned whether defendant would have wanted the jury to know the prior conviction involved great bodily injury, because he was alleged to have inflicted great bodily injury in the present case.

---

[6] Assault with a deadly weapon and assault with force likely to produce great bodily injury are both moral turpitude offenses and may be used for impeachment. (*People v. Elwell* (1988) 206 Cal.App.3d 171, 175.)

At the hearing on the motions, the parties first established the factual basis for the motions. Mr. Newman said he based the facts stated in his motion on his investigator's personal interview of Mr. Tarman, but agreed those facts did not differ significantly from the facts stated in Mr. Tarman's declaration, and he did not object to the court considering Mr. Tarman's declaration. Neither side asked the court to consider defendant's declaration filed with Mr. Tarman's original motion, but the court considered it.

Mr. Newman argued Mr. Tarman rendered prejudicially ineffective assistance by failing to timely investigate the assault conviction, ascertain whether it involved the use of a weapon, and so advise defendant before defendant would have testified. In response, the prosecutor reiterated that he told Mr. Tarman of the nature of the conviction before he rested his case; argued it was hard to believe Mr. Tarman did not tell defendant about the nature of the conviction before defendant would have testified; and argued it appeared defendant made a tactical decision not to testify because he would have been impeached with "the 1997" section 245, subdivision (a)(1) conviction, which involved great bodily injury.

The court denied the motion. The court agreed it would probably have been a tactical error or unwise had defendant testified, because he would have been impeached with several prior offenses involving moral turpitude, in addition to his extensive gang involvement. The court also pointed out that defendant got his self-defense claim into evidence through Hilario's testimony, without risking his own impeachment. The court

30

ruled Mr. Tarman did not render ineffective assistance in recommending against defendant testifying, and even if he did, there was no reasonable probability defendant would have realized a more favorable result had he testified.

2. Analysis

"'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.'" (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) Though not listed in section 181, a motion for a new trial may be based upon ineffective assistance of counsel. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-584.)

To establish a claim of ineffective assistance of counsel, the defendant must show counsel's representation fell "below an objective standard of reasonableness" under prevailing professional norms and there is a reasonable probability that but for counsel's error the defendant would have realized a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 693; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.)

The bottom line is defendant did not show he was prejudiced by anything Mr. Tarman did or did not do regarding his 1997 assault conviction or in advising him not to testify. There is no reasonable probability defendant would have realized a more favorable result had he testified.

Had defendant testified, the prosecutor certainly would have impeached him with his 1997 conviction for assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), along with his extensive history of gang involvement, in addition to

31

his 1999 grand theft and 2000 corporal injury convictions. His defense was that he acted in self-defense, whether reasonably or unreasonably, or in the heat of passion, as indicated by Hilario's testimony for the defense.[7] As the court pointed out, defendant effectively got his defense theories to the jury through Hilario's testimony, without risking his own impeachment. In view of the entire record, it is not reasonably likely defendant's testimony would have materially aided his defense theories.

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING             
J.

We concur:

RAMIREZ       
P. J.

CODRINGTON    
J.

---

[7] The jury was instructed on voluntary manslaughter based on unreasonable self-defense and heat of passion, but the court ruled there was insufficient evidence to warrant the self-defense instructions defense counsel requested.

32